**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

UNION HOME MORTGAGE CORP.,     )
                           )
     Plaintiff,           )
                           )   Case No.   1:23-cv-996
v.                      )
                           )
EVERETT FINANCIAL INC., dba     )
SUPREME LENDING, ANDREW KYLE  )
TUTTLE, JAMES M. FISHER,       )
KATHRYN HENRY, and RYAN      )
LARSON,                     )
                           )
     Defendants.        )

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Union Home Mortgage Corp. ("Union Home"), by counsel, for its Verified Complaint for Injunctive Relief and Damages against Defendants Andrew Kyle Tuttle ("Tuttle"), James M. Fisher, Kathryn Henry, and Ryan Larson (collectively the "Individual Defendants") and Everett Financial Inc., dba Supreme Lending ("Supreme") and, alleges and states as follows:

## BACKGROUND

1.     Union Home brings this action against the Individual Defendants, its former employees, for breaches of their contractual covenants. Furthermore, as to Tuttle, Union Home also asserts claims for breaches of his common-law duties to Union Home. Finally, as to Supreme, a direct competitor of Union Home and the Individual Defendants' current employer, for its tortious interference with Union Home's contracts.

2.     Most significantly, Union Home's former District Manager, Tuttle, and others with contractual duties to Union Home, violated their restrictive covenants by, directly or indirectly,

soliciting Union Home's employees causing a mass exodus of approximately 50 employees in the Florida market. This was done with the full knowledge, support, and encouragement of Supreme.

## PARTIES

3. Union Home is in the business of providing homeowners and prospective home buyers with mortgage and refinance loan products.

4. Tuttle was previously employed by Union Home as a District Manager, at its office located in Spring Hill, Florida.

5. James M. Fisher ("Fisher") was previously employed by Union Home as an Area Sales Manager, in one of Union Home's Florida offices.

6. Kathryn Henry ("Henry") was previously employed by Union Home as Branch Manager, in one of Union Home's Florida offices.

7. Ryan Larson ("Larson") was previously employed by Union Home as a Branch Manager, in one of Union Home's Florida offices.

8. Supreme is a market competitor to Union Home in the home mortgage lending and refinancing industry that advertises having 31 offices in Florida.

9. According to the Nationwide Multistate Licensing System ("NMLS"), the Individual Defendants are all now employed by Supreme at its Florida offices, though mainly at the Tampa office.

## JURISDICTION AND VENUE

10. Paragraphs 1-9 are incorporated herein by reference as if fully restated herein.

11. This is an action seeking injunctive relief and damages against the Individual Defendants based on violations of their respective Conditional Retention Bonus and Employee Agreement with Union Home (the "Employment Agreements"). Individual Defendants'

Employment Agreements are attached as **Exhibit A**. Union Home further seeks an injunction and damages for Tuttle's violations of his common law duties to Union Home. Finally, Union Home seeks injunctive relief and damages against Supreme for its facilitation and inducement of said violations by former Union Home employees, including but not limited to the Individual Defendants, in tortious interference with Union Home's rights.

12.     Union Home is an Ohio corporation with its principal place of business in Strongsville, Ohio.

13.     Supreme is a corporation headquartered in Dallas, Texas. Supreme is licensed to do business in Ohio and has an office location in Ohio.

14.     Upon information and belief, all of the Individual Defendants are residents and citizens of Florida.

15.     The Individual Defendants currently owe Union Home well in excess of $75,000.

16.     In addition, the damages caused by Supreme's tortious actions resulting in the departure of 50 Union Home employees, plainly exceeds $75,000.

17.     "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 347 (1977).

18.     Jurisdiction is proper in federal court pursuant to 28 U.S.C. § 1332, as this is a civil action in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

19.     The Employment Agreements state that "any claim arising out of or related in any way to the Employee's employment or termination of that employment, including claims arising under this Agreement, shall be filed in a state or federal court in Ohio. Employee and the [Union

Home] consent to personal jurisdiction in such a court and waive any right to seek a transfer of venue or to assert *forum non-conveniens*."  Exs. A-C, ¶ 16.

20.     The Court has jurisdiction to hear this case and venue is proper in this Court because the Individual Defendants consented to personal jurisdiction in this Court, Union Home's principal place of business is in Cuyahoga County, and the harm suffered by Union Home, as described herein, was suffered in Cuyahoga County.

21.     Furthermore, this Court has personal jurisdiction over Supreme pursuant to R.C. §§ 2307.381, 2307.382 because Supreme transacts business and contracts to supply services in the state of Ohio through – at a minimum – its Hilliard, Ohio branch office.

22.     The choice of law provision in the Employment Agreements each identify Ohio law as governing "all aspects of this Agreement." *Id.*

23.     The Court also has supplemental jurisdiction over Union Home's contractual claims against Individual Defendants and state law claims against Tuttle and Supreme pursuant to 28 U.S.C. § 1367.

24.     The Court has jurisdiction to hear this case and venue is proper in this Court.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District as Union Home resides in Cuyahoga County and also because Individual Defendants are subject to this Court's personal jurisdiction with respect to this action.

## FACTUAL BACKGROUND

### Amerifirst, Brown, and the Individual Defendants

26.     Paragraphs 1-25 are incorporated herein by reference.

27.     Amerifirst Financial Corporation ("Amerifirst") was a competitor of Union Home and Supreme for years.

28.     Amerifirst employed the Individual Defendants as well as its Southeast Regional Manager, Jamie Brown ("Brown"), in Florida.

29.     Brown worked for Amerifirst for more than five years.

30.     Tuttle worked for Amerifirst for more than three years.

31.     Amerifirst maintained employment agreements with certain managerial employees, which included restrictive covenants, such as a prohibition on soliciting its employees for a period of time.  Amerifirst maintained such an agreement with Brown.  (**Exhibit B** – Amerifirst-Brown Agreement).

32.     Throughout the years that Brown and the Individual Defendants worked for Amerifirst, they were exposed to the company's confidential information and goodwill.

### Union Home's Acquisition of Amerifirst

33.     In November 2022, Union Home agreed to purchase certain assets and liabilities of Amerifirst, effective December 31, 2022 (the "Sale").  The purchase price was millions of dollars.

34.     In conjunction with the Sale, Union Home acquired, among other things, Amerifirst DBAs and all of Amerifirst's confidential information and goodwill.

35.     In conjunction with the Sale, the employment agreements between Amerifirst and its managerial employees and all rights thereunder were explicitly assigned to Union Home. (**Exhibit C** – Assignment).

36.     This assignment included the employment agreement between Amerifirst and Brown.

**Brown's Response to the Sale**

37.    After the Sale was announced, Brown began to meet with competing mortgage companies in an effort to move large numbers of employees in violation of his employment agreement.

38.    For example, Brown, in conjunction with Tuttle and others, coordinated meetings and other communications between employees and a competitor known as Cherry Creek Mortgage.

39.    As a result, at least one high producing Loan Officer did in fact resign and become employed with Cherry Creek Mortgage.

40.    Likewise, Brown, in conjunction with Tuttle and others, coordinated meetings and other communications between employees and a competitor known as Primary Residential Mortgage, Inc.

41.    Upon learning of these efforts, Union Home met with Brown in an effort to convince him to align with Union Home and to cease the solicitation of its employees in violation of the employment agreement that had been assigned to Union Home.

42.    When these efforts were unsuccessful, Union Home also offered Brown a severance agreement accompanied by a significant payment, which he also rejected.

43.    Following Brown's meeting with Union Home, he instructed one or more of his high-ranking colleagues not to attend their scheduled meeting with Union Home implying that if he was leaving then they were all leaving.

44.    By January 2023, Brown had gone to work for Union Home's competitor, Supreme, and began soliciting Union Home employees to leave Union Home and become employed by Supreme.

45.     On January 31, 2023, Union Home contacted Brown to remind him of his contractual obligations, including the need to refrain from soliciting Union Home's employees.

46.     On February 3, 2023, Union Home contacted Supreme to remind it of Brown's contractual obligations, including the need for him to refrain from, directly or indirectly, soliciting Union Home's employees.

47.     On information and belief, Supreme was aware of Brown's employment agreement prior to February 3, 2023.

### The Individual Defendants' Employment with and Contractual Obligations to Union Home

48.     Paragraphs 1-47 are incorporated herein by reference.

49.     Unlike Brown, the Individual Defendants each signed new employment agreements with Union Home in December 2022.  (**Exhibit A**).

50.     Via the Employee Agreements, the Individual Defendants agreed that, until December 2026 -- two years after the end of the restricted period -- they would not "directly or indirectly, on behalf of themselves or a Competitive Entity, employ or seek to employ any person who is employed by [Union Home] or otherwise induce such person to leave his/her employment with [Union Home]." (*Id.* at ¶ 6).

51.     The Individual Defendants also agreed that any violation of these covenants would cause Union Home irreparable harm and, as a result, specifically "consent[ed] to the issuance of a restraining order and/or an injunction." (*Id.* at ¶15).

52.     The Individual Defendants also agreed to "devote [their] best efforts to such employment [with Union Home] as long as it shall continue."  (*Id.* at ¶1).

53.     Further, the Individual Defendants agreed that they "shall be liable for any attorneys' fees expended by [Union Home] to enforce [the Employee Agreement]."  (*Id.* at ¶15).

7

54.     The Employee Agreements are binding and enforceable contracts between Union Home and the Individual Defendants.

55.     Union Home performed its material obligations under the Employee Agreements.

56.     The Individual Defendants owed and continue to owe contractual obligations to Union Home pursuant to the Employee Agreements.

### The Individual Defendants Resign from Union Home and Fail to Repay Their Conditional Retention Bonuses

57.     Under the Employment Agreements, the Individual Defendants were paid a conditional retention bonus as an unvested advance that each would earn in full by remaining employed by Union Home for two (2) years.

58.     The Employee Agreements provided that, if their "employment with [Union Home] ends for any reason prior to the second anniversary of the Effective Date [in December 2024], Employee agrees to repay the entire bonus to [Union Home]." Exhibit A, ¶ 4(a). The Employee Agreements require repayment of the bonus within 15 days after the termination of employment. *Id.*, ¶ 4(b).

59.     On April 28, 2023, the Individual Defendants, including Tuttle, resigned from Union Home with no advance notice, and were part of just shy of 50 other Union Home employees who joined Brown at Supreme.  In response, Union Home demanded repayment of the bonuses in full.

60.     The bonuses paid to the Individual Defendants total in excess of $450,000. Specifically, the Individual Defendants received conditional payments in the following amounts:

| Andrew Kyle Tuttle | $138,525 |
|---|---|
| James M. Fisher | $138,525 |

| Kathryn Henry | $92,350 |
|---|---|
| Ryan Larson | $92,350 |

61.     However, the Individual Defendants each failed to complete the repayment of their bonuses as required under the Employee Agreements.

62.     Under the Employment Agreement, the Individual Defendants agreed that if they failed to timely repay their bonus they would "pay [Union Home] all such costs and fees associated with those [collection] efforts, including the [Union Home's] legal fees." *Id.*

### Tuttle and Other Departing Union Home Employees Immediately Begin Working for Supreme and Solicit Other Union Home Employees to Join Them

63.     Beyond Brown's direct solicitation of Union Home employees on behalf of Supreme, there is evidence that Tuttle and others helped facilitate the move of almost 50 employees from Union Home to Supreme while still on Union Home's payroll.

64.     This is a familiar scheme for both Brown and Tuttle, as they were previously involved in separate lawsuits involving their improper solicitation of employees.

65.     For example, in 2018, Brown's former employer (Movement Mortgage) sued his then current employer in the Middle District of Florida under Case No. 8:18-cv-577-VMC-MAP, alleging a variety of wrongdoing, including that Brown's "solicitation of Movement employees was part of a much larger plan, executed in coordination with and at the direction of [his new employer]." (Dkt. 58, p. 10).

66.     Similarly, in 2020, Tuttle's former employer (Patriot Lending) sued him and his then current employer in the Middle District of Florida under Case No. 8:20-cv-00264-WFJ-AEP, alleging a variety of wrongdoing, including that Tuttle facilitated the solicitation of Patriot's

employees by providing his new employer details about them and their employment.   (Dkt. 42, p. 10).

67.     The available information strongly suggests that Brown and Tuttle have a history of improperly soliciting their coworkers and subordinates in violation of contractual obligations.

68.     In this case, Union Home has been informed that the solicited employees received emails from Supreme at their personal email accounts and text messages from Supreme on their personal cell phones *without having provided Supreme such information*.

69.     Further, Tuttle took a group of his Union Home subordinates to visit Supreme's headquarters in Dallas, Texas on or about April 12, 2023, before every single one of them departed for Supreme on or about April 28, 2023.  In fact, Tuttle is believed to have taken his Union Home-issued laptop with him to Supreme and logged on to Union Home's system from Dallas.

70.     On information and belief, upon returning from Dallas, Tuttle conferred with one or more Union Home employees about becoming employed by Supreme.

71.     Tuttle also received income statements from one or more of the now-former Union Home employees immediately prior to their departure.  This allowed Tuttle and Supreme to validate the loan officer's ability to generate business and/or set his compensation at Supreme. This is universally done in the industry when hiring loan officers.

72.     After the trip to Dallas, there was a noticeable decline in new applications submitted to Union Home between April 12th and April 28th, a concern that was explicitly raised with one or more loan officers.

73.     On April 28, 2023, a loan officer assistant who was departing for Supreme confessed that she had been aware for approximately two weeks of the overarching scheme to divert approximately 50 employees from Union Home to Supreme on the same day.

74.     Upon information and belief, Tuttle and others, in conjunction with Brown and Supreme, contacted many of the now-former Union Home employees to entice them to leave Union Home and join Supreme.

75.     Upon information and belief, Tuttle and others, in conjunction with Brown and Supreme, used and disclosed information about now-former Union Home employees to entice them to leave Union Home and join Supreme.

76.     To illustrate the breadth and comprehensiveness of the solicitation, below is an excerpt from an organizational chart showing that every subordinate of Tuttle has left for Supreme.



77.    The chart in the prior paragraph does not illustrate every employee who was solicited and left Union Home for Supreme.  However, this group was previously led by Brown and every single member of it left Union Home for Supreme under the leadership of Tuttle.

78.     Upon information and belief, Tuttle, in conjunction with Brown and Supreme, directly or indirectly solicited now-former Union Home employees to entice them to leave Union Home and join Supreme.

79.     Since before November 2022, Supreme has been aware that Union Home requires its loan officers and managers to execute restrictive covenant agreements, including those prohibiting the solicitation of employees.  In fact, Supreme's Chief Operating Officer was a Senior Vice President with Union Home for over five years who had first-hand exposure to Union Home's enforcement of its restrictive covenants.

## COUNT I:  BREACH OF CONTRACT (FAILURE TO REPAY BONUS) (INDIVIDUAL DEFENDANTS)

80.     Paragraphs 1-79 are incorporated herein by reference.

81.     The Employee Agreements are valid and enforceable contracts.

82.     Union Home has performed all of its obligations under these Employee Agreements.

83.     Union Home paid the Individual Defendants each a conditional retention bonus of under their Employee Agreements, which the Individual Defendants agreed to return in full, within 15 days, if their employment with Union Home ended before December 2024.

84.     The Individual Defendants' employment with Union Home ended on April 28, 2023, and they were obligated to return the full amount of their bonuses by May 13, 2023.

85.     The Individual Defendants failed to repay their bonuses.

86.     Union Home is entitled to repayment of the bonuses that were paid as well as its costs of collection (including attorneys' fees), pursuant to the Employee Agreements and all other relief deemed just and proper.

## COUNT II:  BREACH OF NON-SOLICITATION COVENANT
### (TUTTLE)

87.     Paragraphs 1-86 are incorporated herein by reference as if fully restated herein.

88.     Tuttle's direct or indirect solicitation of Union Home's employees breached his contractual obligations, as stated in his Employee Agreement.

89.     The breaches by Tuttle of his obligation to refrain from soliciting Union Home's employees, pursuant to his Employee Agreement, has caused and will continue to cause irreparable injury, loss, and damage to Union Home.

90.     As a result of Tuttle's breach, Union Home is entitled to an injunction, the recovery of damages, and its legal fees and costs and all other relief deemed just and proper.

## COUNT III:  BREACH OF CONTRACTUAL DUTY OF LOYALTY
### (TUTTLE)

91.     Paragraphs 1-90 are incorporated herein by reference as if fully restated herein.

92.     While employed by Union Home, Tuttle owed a contractual duty of loyalty to Union Home as specified in his Employee Agreement.

93.     While employed by Union Home, Tuttle conspired with Supreme and one or more former Union Home employees to facilitate the transfer of current Union Home employees to Supreme, in violation of his contractual duty of loyalty.

94.     Tuttle's breaches of his contractual duty of loyalty pursuant to the Employee Agreement have caused injury, loss, and damage to Union Home.

95.     As a result of Tuttle's breach, Union Home is entitled to the recovery of damages and its legal fees and costs and all other relief deemed just and proper.

## COUNT IV:  BREACH OF COMMON LAW DUTY OF LOYALTY
### (TUTTLE)

96.     Paragraphs 1-95 are incorporated herein by reference as if fully restated herein.

14

97. While employed by Union Home, Tuttle owed a common law duty of loyalty to Union Home.

98. While employed by Union Home, Tuttle conspired with Supreme and one or more former Union Home employees to facilitate the transfer of current Union Home employees to Supreme, in violation of his common law duty of loyalty.

99. Tuttle's breaches of his contractual duty of loyalty pursuant to the Employee Agreement have caused injury, loss, and damage to Union Home.

100. As a result of Tuttle's breach, Union Home is entitled to the recovery of damages, including punitive damages, and its legal fees and costs and all other relief deemed just and proper.

## COUNT V- TORTIOUS INTERFERENCE WITH CONTRACT (SUPREME)

101. Paragraphs 1-100 are incorporated herein by reference as if fully stated herein.

102. Tuttle's Employee Agreement with Union Home is a valid and binding contract. (**Exhibit A**).

103. Brown's employment agreement that was assigned to Union Home is a valid and binding contract. (**Exhibit B**).

104. At all relevant times, Union Home performed its obligations under these two contracts.

105. Pezzani, Chief Operating Officer at Supreme, was formerly a Union Home employee and was intimately familiar with Union Home contracts and employment covenants. Accordingly, Supreme had actual knowledge of the terms of Union Home's employee agreements.

106. To the extent that Supreme was not aware of the Employee Agreement from Pezzani, other Union Home employees, or from its industry knowledge of Union Home's use of such agreements, Union Home specifically informed Supreme of the existence of Union Home's

employee agreements and the relevant terms of such agreements. Union Home informed Supreme of the non-solicitation provision in its employee agreements, and that Supreme's aid in solicitation of any Union Home employee would subject it to liability.

107.    Through Tuttle and Brown's, direct or indirect, solicitation of current Union Home employees to join Supreme, they breached their respective agreements with Union Home.

108.    As detailed herein, Tuttle also violated other covenants and/or obligations within the Employee Agreements, including duties of loyalty while still employed by Union Home.

109.    These actions were induced and facilitated by Supreme which ultimately hired approximately 50 Union Home employees after they were improperly solicited.

110.    Supreme's interference with the Employee Agreement was intentional and deliberate, without justification, and with malice or conscious disregard of Union Home's contract rights in the Employee Agreement.

111.    Supreme's tortious interference with these agreements has caused and will continue to cause irreparable injury, loss, and damage to Union Home.

112.    As a result of Supreme's tortious interference, Union Home is entitled to the recovery of damages, including punitive damages, and its legal fees and costs and all other relief deemed just and proper.

## **PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

113.    Paragraphs 1-112 are incorporated herein by reference as if fully restated herein.

114.    As a direct and proximate result of the Individual Defendants' conduct, Union Home has suffered, and will continue to suffer, irreparable harm in the loss of valuable employees and resulting business opportunities.

115.     In the Employee Agreements, the Individual Defendants expressly acknowledged and agreed that a remedy at law for any breach or threatened breach of the provisions of the Employee Agreements would be inadequate, thereby warranting issuance of injunctive relief.

116.     The Individual Defendants have and continue to willfully violate the Employee Agreement.

117.     Without injunctive relief against Tuttle and Supreme, and all those in active concert or participation with them, including Brown, the improper solicitation of Union Home's employees will continue, thereby causing Union Home immediate and irreparable harm. In contrast, no harm will accrue to Tuttle or Supreme by entry of injunctive relief as they never had the right to violate or procure the violation of the contractual obligations to Union Home.

118.     Injunctive relief is appropriate to protect and maintain Union Home's legitimate business interests. In the absence of injunctive relief, it is highly unlikely that Union Home will have the ability to precisely calculate the extent of the harm caused by Tuttle's actions and/or the actions of Supreme.

119.     The public interest will not be harmed if an injunction is granted.

120.     Given the Individual Defendants' willful and deliberate violations of their obligations any bond required to be posted by Union Home should be *de minimis.*

WHEREFORE, Union Home respectfully requests that the Court grant the following relief:

A.     Issue a preliminary and then permanent injunction against Tuttle and Supreme, and all those in active concert or participation with them requiring specific performance of the terms and conditions of the Employee Agreements and prohibiting them from soliciting Union Home's employees in violation of the Employee Agreements;

B.      Enter judgment in favor of Union Home and against the Individual Defendants and Supreme on all counts in an amount to be determined at trial and to pay damages to Union Home, including, but not limited to, compensatory and punitive damages, costs, interest, and reasonable attorneys' fees; and

C.      Grant all other relief the Court deems just and proper in the circumstances.

## **VERIFICATION**

I, Douglas Long, an employee of Union Home Mortgage Corp., verify under penalties of perjury that the foregoing facts and allegations are true and accurate to the best of my knowledge and belief.

Dated: May 16, 2023

DocuSigned by:

_____
Douglas Long

Respectfully submitted,

*/s/ Jason T. Clagg*

Jason T. Clagg (0097303)
(jason.clagg@btlaw.com)
**BARNES & THORNBURG LLP**
888 S. Harrison Street, Suite 600
Fort Wayne, IN 46802
Phone:  (260) 423-9440
Fax:  (260) 424-8316

and

Paul N. Garinger (0079897)
(paul.garinger@btlaw.com)
Kyle R. Gerlach (0093433)
(kyle.gerlach@btlaw.com)
**BARNES & THORNBURG LLP**
41 South High Street, Suite 3300
Columbus, OH  43215
Phone: (614) 628-0096
Fax:  (614) 628-1433

ATTORNEYS FOR PLAINTIFF